UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------ x
                :
BRITTANY L. CUSHMAN         :         3:19 CV 344 (RMS)
                :
V.                :
                :
ANDREW M. SAUL, COMMISSIONER :
OF SOCIAL SECURITY        :        DATE: MARCH 26, 2020
                :
------------------------------------------------------ x

RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER AND ON THE DEFENDANT'S MOTION TO AFFIRM THE DECISION
OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks review of a final decision by the Commissioner of Social Security ["SSA" or "the Commissioner"] denying the plaintiff Child's Insurance Benefits and Supplemental Security Income ["SSI"].

I.     ADMINISTRATIVE PROCEEDINGS

On June 10, 2015, the plaintiff filed an application for Child's Insurance Benefits, alleging disability due to bipolar disorder, manic depression, dyslexia, learning disability, mental health, suicidal ideation, and anxiety, beginning June 8, 1993, the plaintiff's date of birth. (Certified Transcript of Administrative Proceedings, dated May 28, 2019 ["Tr."] 61-62, 72-73). The plaintiff also filed an application for SSI on April 1, 2016. (Tr. 216-224). The plaintiff subsequently amended her alleged onset date to January 7, 2010. (Tr. 37). The plaintiff's applications were denied initially, (Tr. 61-71, 72-82, 110-113, 116-117), and upon reconsideration. (Tr. 85-95, 96-106, 121-127). On December 28, 2016, the plaintiff requested a hearing before an Administrative Law Judge ["ALJ"], (Tr. 135), and on March 8, 2018, a hearing was held in Hartford, Connecticut before ALJ Ryan Alger, at which the plaintiff and a vocational expert testified. (Tr. 34-60). The

ALJ subsequently issued an unfavorable decision on March 29, 2018, denying the plaintiff's claims for benefits. (Tr. 12-28). The plaintiff appealed to the Appeals Council on May 2, 2018, (Tr. 211-212), which, on January 17, 2019, denied the plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-6).

On March 8, 2019, the plaintiff filed her complaint in this pending action. (Doc. No. 1). The parties consented to the jurisdiction of a United States Magistrate Judge on April 24, 2019, and this case was transferred to the undersigned. (Doc. No. 9). On May 28, 2019, the defendant filed the administrative transcript. (Doc. No. 13). On August 26, 2019, the plaintiff filed her Motion to Reverse the Decision of the Commissioner (Doc. No. 18), with a Statement of Material Facts (Doc. No. 18-2), and brief in support (Doc. No. 18-1 ("Pl.'s Mem.")). On October 21, 2019, the defendant filed his Motion to Affirm (Doc. No. 19), with a Statement of Material Facts (Doc. No. 19-2), and brief in support. (Doc. No. 19-1 (Def.'s Mem.")).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 18) is DENIED, and the defendant's Motion to Affirm the Decision of the Commissioner (Doc. No. 19) is GRANTED.

II.   FACTUAL BACKGROUND

    A.   MEDICAL RECORDS

The Court presumes the parties' familiarity with the plaintiff's medical history, which is discussed in the parties' respective Statements of Material Facts (Doc. Nos. 18-2, 19-2). Though the Court has reviewed the entirety of the medical record, it cites only the portions of the record that are necessary to explain this decision.

## B.    HEARING TESTIMONY

At the plaintiff's hearing, she was 24 years old. (Tr. 39). She lived with her father and went to her mother's "every other week." (Tr. 39). Her mother would come get her because she did not drive. (Tr. 39-40). She never tried to obtain a license because she was too scared to drive. (Tr. 43). She was "not very sure" if she had finished the 11th grade. (Tr. 39). She testified that her parents told her she was "in 12th grade for a little bit," but she "only remember[ed] 11th grade." (*Id.*). While in school, she received special education and speech services. (Tr. 42). She also saw a counselor beginning in first grade until high school. (Tr. 54). After leaving school, she did not try to obtain a GED. (Tr. 39). She also never had a job except for a "school job." (Tr. 40).

The plaintiff testified that she could make her own meals and could do her own cleaning and laundry. (Tr. 40). She explained, however, that she made "easy meals like chicken nuggets" and "only when [she] fe[lt] like getting up." (Tr. 48). Some days she would not eat at all. (*Id.*). She would do her laundry once a month and clean her room "when it [got] bad enough and when [she] [felt] okay to do it." (Tr. 49). She would also vacuum and change the litter box when asked by her father. (*Id.*). She did not do such chores, however, when she felt like she was not able to do so. (Tr. 50). She did not have any friends she visited outside the house, except for a "friend next door that [she saw] maybe once every four months." (Tr. 40). She would go to the store with her mother, and although "it [was] hard being around a lot of people," it was "calming . . . [to] have [her] mother with [her]." (Tr. 41-42). She would not go to the store or anywhere else where she would be around people by herself. (Tr. 46-47). She also showered "sometimes twice a week, more once a week" and "chang[ed] [her] clothes only when [she] [took] a shower." (Tr. 48). She spent her days watching YouTube, listening to music, and using her computer. (Tr. 53).

When asked about her physical ailments, she explained that her back, legs, and arms "bother[ed] [her]." (Tr. 40). She testified that "it's all through the body, so [she] [thought] it [was] nerves." (Tr. 41). She attended physical therapy "for a little bit for [her] back," and she also saw a rheumatologist. (Tr. 43). She was in pain "[a]ll the time," everywhere in her body, with the pain being worse in her back and arms. (Tr. 44). She testified that the pain "sometimes" affected her ability to stand and walk. (*Id.*). She explained that she could walk "maybe for 10 minutes" before "start[ing] [to] feel[] pain," and she could stand in place for "maybe up to 30 minutes" before having to sit down. (Tr. 45). The plaintiff also testified to problems sleeping. She explained that she would "sometimes . . . stay awake for two days straight because [she could not] fall asleep." (Tr. 52). She would try to keep to a sleep schedule. (*Id.*). She did not leave her house every day because she was "afraid of the people around [her]," "afraid of getting kidnapped." (*Id.*).

She also attended counseling "every Thursday." (Tr. 41). She had been seeing her therapist for "almost two years" at the time of the hearing. (Tr. 46). According to the plaintiff, her doctor "used to prescribe" medications for her but she was not taking medications at the time of the hearing because they "made [her] feel worse." (Tr. 41). She had not taken medication "since last year." (Tr. 54). She also explained that she was scared to take her sleeping pills. (*Id.*). She testified that her problems with depression and anxiety had existed since she was young, but that she did not "fully notice" them until the 11th grade. (Tr. 45). She explained that she experienced "basically hopelessness, wanting to die," and that she "heard voices every day." (Tr. 46). She had trouble making doctor's appointments and other phone calls because she "[did not] want to say something wrong" and then "start feeling worthless." (Tr. 50). She also experienced tearfulness "a lot," "like once a week maybe or sometimes . . . up to three days a week." (Tr. 51). She had suicidal thoughts "every day." (*Id.*). When asked whether she had ever acted on her suicidal thoughts, the plaintiff

testified that she had acted on them "a month ago" by pressing a knife against her wrist and that she had "wanted to" act on them again two weeks ago but did not. (Tr. 51). Her therapist had suggested she needed a higher level of care, which she had thought about, but she did not want to go to "a group" "because of the people." (*Id.*).

Mr. Eric Dennison, a vocational expert ("VE"), then testified. The ALJ first asked the VE to consider a hypothetical person, of the plaintiff's age, education, and work experience, who could work at all exertional levels, and who could carry out and remember simple instructions in a work place with few changes, could have no interaction with the general public, and could only have limited interaction with coworkers, no more than ten percent of the workday. (Tr. 56). Such interaction with coworkers would be superficial interaction, with no reliance on team members or work in groups. (*Id.*). The VE testified that such a person could perform the jobs of stuffer, machine feeder, and "bander, hand," all unskilled jobs of the light exertional level. (Tr. 57). The ALJ then asked the VE to assume an individual, of the plaintiff's age, education, and work experience, who could work at all exertional levels, and who could carry out and remember simple instructions in a work place with few changes and have no interaction with the public or coworkers. (Tr. 58). The VE testified that no jobs existed for such a person. (*Id.*). Finally, the VE testified that no jobs existed for a person who would be off task fifteen percent or more of the workday. (*Id.*).

C.    OPINION EVIDENCE

Dr. Gail Ash-Morgan, PhD, a psychiatrist, completed her medical source statement on April 6, 2016. (Tr. 317-21). Dr. Ash-Morgan saw the plaintiff weekly from September 29, 2015 to October 26, 2015, but the plaintiff's treatment was "interrupted" by "transportation problems." (Tr. 317). The plaintiff was not taking psychiatric medications. (*Id.*). Dr. Ash-Morgan described the plaintiff's appearance as "casual," with "appropriate attire." (Tr. 318). She indicated that the

plaintiff had a depressed mood, fair judgment and insight, and showed no evidence of psychosis. (*Id.*). She opined that the plaintiff had a limited ability to take care of personal hygiene, to use appropriate coping skills, and to handle frustration appropriately, a reduced ability to care for physical needs, and an average ability to use good judgment regarding safety and dangerous circumstances. (Tr. 319). She also opined that the plaintiff had a limited ability to interact appropriately with others, to ask questions or request assistance, to respect and respond appropriately to others in authority, and to get along with others without distracting them or exhibiting behavioral extremes. (Tr. 20). Finally, she opined that the plaintiff had a limited ability to carry out both single-step and multi-step instructions, to focus long enough to finish simple activities or tasks, to change from one simple task to another, to perform basic activities at a reasonable pace, and to persist in simple activities without interruption from psychological symptoms. (Tr. 320).

Ms. Jessica Delaney, a licensed marriage and family therapist ("LMFT") who was treating the plaintiff as her therapist, completed a medical source statement on October 13, 2016. (Tr. 329-35). Ms. Delaney saw the plaintiff once a week from June 9, 2016 to October 13, 2016. (Tr. 331). She noted the plaintiff's diagnoses of "major depressive disorder – moderate severe" and generalized anxiety disorder. (*Id.*). She also stated that the plaintiff reported "problems with memory" and "extreme trouble with concentration." (Tr. 332). She described the plaintiff's general appearance as "somewhat unkempt," with "questionable hygiene/grooming." (*Id.*). According to Ms. Delaney, the plaintiff's speech was normal, she experienced auditory hallucinations (voices telling her "she is not good enough" and to "give up"), her mood was depressed, with a blunted flat affect, and her judgment and insight were "[f]air-[g]ood." (*Id.*). As to activities of daily living,

the plaintiff "d[id] not always bathe [or] brush [her] hair," and she would "forget[] to eat" or not "feel motivated [and] skip[] eating." (Tr. 333).

Ms. Delaney opined that the plaintiff had a reduced ability to take care of personal hygiene, an average ability to care for physical needs, a better than average ability to use good judgment regarding safety and dangerous circumstances, an average ability to use appropriate coping skills, and a limited ability to handle frustration. (*Id.*). As to the plaintiff's social interactions, Ms. Delaney opined that the plaintiff had a limited ability to interact appropriately with others, no ability to ask questions or request assistance, a better than average ability to respect and respond appropriately to others in authority, and a reduced ability to get along with others without distracting them or exhibiting behavioral extremes. (Tr. 334). Finally, she opined that the plaintiff had an average ability to carry out single-step instructions and to perform basic activities at a reasonable pace, a reduced ability to carry out multi-step instructions, to focus long enough to finish simple activities or tasks, and to change from one simple task to another, and a limited ability to persist in simple activities without interruption from psychological symptoms. (*Id.*).

Dr. Charles A. Vassilopulos, PhD, a consultative examiner, conducted two examinations of the plaintiff, on March 19, 2014 and June 17, 2016. (Tr. 344-47, 438-43). On March 19, 2014, the plaintiff reported that she "sat in her room and operated her computer" during the day because she "felt unsafe leaving her room." (Tr. 439). She had ten online friends with whom she communicated. (*Id.*). She dressed and showered every day and brushed her teeth once a week. (*Id.*). Dr. Vassilopulos noted that the plaintiff's "affect" and her "mood" were "depressed." (Tr. 440). She had "low self-esteem and a poor sense of self-worth." (*Id.*). She reported difficulties sleeping. (*Id.*). She had experienced suicidal ideations and had made plans for suicide, but she had not done so recently. (*Id.*).

Dr. Vassilopulos noted "significant vegetative symptoms." (*Id.*). The plaintiff's orientation, concentration and immediate memory were in the low average range. (Tr. 440-41). Her delayed memory, memory retrieval, and memory for instructions were in the average range, while her memory for contextual information was in the mildly impaired range. (Tr. 440). Her construction, calculation, attention and reasoning were in the low average to average range. (Tr. 441). Her interpretation of proverbs and judgment were mildly impaired. (*Id.*). Her insight was poor. (*Id.*). Dr. Vassilopulos noted that "the prognosis was poor." (Tr. 443). The plaintiff "understood and remembered simple instructions." (*Id.*). Dr. Vassilopulos opined that she had "no impairment in executing simple instructions," "no impairment in making simple work-related judgments," "no impairment in remembering and understanding complex instructions," and "no impairment in implementing complex instructions." (*Id.*). She did, however, have a moderate impairment in "making complex work-related judgments, in interacting with the public, in interacting with supervisors appropriately, in interacting appropriately with co-workers, and in being able to respond appropriately to usual work situations and changes in routine work settings." (*Id.*). She also "showed moderate problems with communication." (*Id.*). He diagnosed the plaintiff with major depressive disorder and agoraphobia. (*Id.*).

At the second examination, on June 17, 2016, the plaintiff reported symptoms of depression, mood changes, suicidal ideations, and mania. She explained that she would sit and hold her head crying until she had difficulty breathing. (Tr. 344). She also reported that she remained awake for twelve to twenty-four hour periods of time. (*Id.*). Dr. Vassilopulos noted that the plaintiff was not taking any medications. (*Id.*). The plaintiff reported that she watched movies, played video games on her computer, and communicated with two or three friends through "messenger" or a video game, but she did not otherwise have any friends. (Tr. 345). She showered

"once every week or every two weeks"; she explained that she "washed her body daily, but not her hair." (*Id.*). She also stated that she "never" brushed her teeth. (*Id.*). Dr. Vassilopulos indicated that her "affect was constricted," "her mood was euthymic," "her self-esteem was low," and "her self-concept was poor." (*Id.*). She had suicidal thoughts three times each week. (Tr. 345-46). Her orientation, memory, reasoning and construction were in the average range, while her calculation, attention, concentration, and interpretation of proverbs was in the low average range. (Tr. 346). She had mildly impaired judgment and poor insight. (Tr. 346-47). Dr. Vassilopulos noted that she "showed significant difficulties with activities of daily living and significant vegetative symptoms." (Tr. 347). He diagnosed her with major depressive disorder, panic disorder and language disorder. (*Id.*). He opined that she "could perform simple commands," but he noted that she "had difficulty interacting with people and coping with conflict or stressful situations" and that "[t]here was some indication that she required frequent supervision." (*Id.*).

State psychological consultant Robert Decarli, PsyD, initially reviewed the plaintiff's Social Security file on July 1, 2016. (Tr. 61-82). Dr. Decarli conducted a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique. He opined that the plaintiff was moderately limited in her ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to work in coordination with or in proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to complete a normal workday and workweek at a consistent pace without an unreasonable number and length of rest periods, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, to respond appropriately to changes in the work setting, to travel in unfamiliar places, and to use public transportation. (Tr. 68-69, 79-80). He also

opined that she was markedly limited in her ability to interact appropriately with the general public. (Tr. 69, 80). In his opinion, however, she was not significantly limited in her ability to carry out very short and simple instructions, to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to make simple work-related decisions, to ask simple questions or request assistance, to maintain socially appropriate behavior, and to adhere to basic standards of neatness and cleanliness. (Tr. 68-69, 79-80). He assessed her as having moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation. (Tr. 66, 77). According to Dr. Decarli, the plaintiff did not meet the "A," "B," or "C" criteria of Listings 12.04 (Affective Disorders) and 12.06 (Anxiety-Related Disorders). (*Id.*).

Douglas Rau, PhD, then reviewed her file on reconsideration on November 2, 2016. (Tr. 85-106). Dr. Rau opined to the same limitations as Dr. Decarli. (*Id.*).

III.    THE ALJ'S DECISION

Following the five-step evaluation process,[1] the ALJ found that the plaintiff had not attained age 22 as of January 7, 2010, her alleged onset date (Tr. 17, citing 20 C.F.R. §§ 404.102,

---

[1] An ALJ determines disability using a five-step analysis. *See* 20 C.F.R. § 404.1520(a) and 416.920(a). First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i) and 416.920(a). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii) and 416.920(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. § 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform her former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv) and 416.1520(a)(4)(iv). If the claimant shows she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if she shows she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform

416.120(c)(4) and 404.350(a)(5)), and that the plaintiff had not engaged in substantial gainful activity since that date. (Tr. 18, citing 20 C.F.R. §§ 404.1571 *et seq.* and 416.971 *et seq.*). At step two, the ALJ concluded that the plaintiff had the severe impairments of bipolar disorder and anxiety disorder, (Tr. 18, citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)), but that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 18-20, citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). The ALJ also found that the plaintiff had the non-severe impairments of attention deficit disorder ("ADD"), joint pain, and obesity. (Tr. 18).

At step three, the ALJ found that, "[a]fter careful consideration of the entire record," the plaintiff had the residual functional capacity ["RFC"] to perform a full range of work at all exertional levels but with the following nonexertional limitations: she could carry out and remember simple instructions in an environment with few changes in the workplace; and she could have no interaction with the public and only limited interaction with coworkers for less than ten percent of the workday. (Tr. 20). The ALJ concluded that there were jobs that existed in significant numbers in the national economy that the plaintiff could perform, including work as a "machine feeder," "stuffer" and "bander, hand." (Tr. 26-27). Accordingly, the ALJ found that the plaintiff was not under a disability at any time from January 7, 2010, the alleged onset date, through March 29, 2018, the date of the ALJ's decision. (Tr. 27-28).

---

alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v) and 416.920(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

IV.    STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). "The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact." *Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citing *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Further, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V.     DISCUSSION

The plaintiff contends that the ALJ 1) incorrectly assessed the plaintiff's joint pain as a non-severe impairment; 2) improperly evaluated the plaintiff's treating clinicians' medical source statements; 3) erred in his evaluation of the plaintiff's subjective symptoms and in his credibility assessment; 4) made an RFC assessment not supported by substantial evidence; 5) failed to apply the standards of SSR 11-2p in assessing the plaintiff's application for benefits; and 6) improperly relied on the vocational experts' testimony. The defendant argues that substantial evidence supported the ALJ's step two determination, RFC finding, and step five finding.

A.     THE SEVERITY OF THE PLAINTIFF'S JOINT PAIN

The plaintiff argues that the ALJ should have found, under step two, that her joint pain was a severe impairment. (Pl.'s Mem. at 3-6). The Court disagrees.

The plaintiff bears the burden of establishing that an impairment is severe. *See Woodmancy v. Colvin*, 577 F. App'x 72, 74 (2d Cir. 2014) (summary order) (citing *Green-Younger v. Comm'r*, 335 F.3d 99, 106 (2d Cir. 2003). The "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment is not, itself, sufficient to deem a condition severe." *Cote v. Berryhill*, No. 17-CV-1843 (SALM), 2018 WL 4092068, at *5 (D. Conn. Aug. 28, 2018) (quoting *McConnell v. Astrue*, No. 03-CV-0521 (TJM), 2008 WL 833968, at *2 (N.D.N.Y. Mar. 27, 2008)). Rather, an impairment is "severe" if it "significantly limits [the plaintiff's] ability to do basic work activities." 20 C.F.R. § 404.1520(c). Basic work activities include, among others, physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying and handling. *See* 20 C.F.R. § 404.1522(b)(1).

Here, the ALJ's finding that the plaintiff's joint pain was not severe is supported by substantial evidence. At the outset, the plaintiff did not present any evidence from any physician

indicating that she had limitations in basic work-related activities due to her joint pain. Further, while the medical records reflect a diagnosis of chronic pain syndrome in February 2018, and reports of back pain beginning in January 2017, they do not establish limitations.

The plaintiff complained of low back pain in January 2017, (Tr. 349, 352, 355, 382), February 2017, (Tr. 385), May 2017, (Tr. 396), July 2017, (Tr. 398), November 2017, (Tr. 598-602), and February 2018. (Tr. 608, 617). In May 2017, APRN Elizabeth Mayerson noted that the plaintiff "continues to have low back pain and sciatica into her right leg." (Tr. 396). Treatment notes reflect that the plaintiff's "gait appear[ed] essentially normal," she had no edema or tenderness, and the "severity of the [plaintiff's] symptoms . . . wax[ed] and wane[d]." (Tr. 396-97). APRN Mayerson noted, however, that "some weakness [was] demonstrated to the [plaintiff's] right quadricep." (*Id.*).

A May 19, 2017 MRI of the plaintiff's lumbar spine was "essentially unremarkable," "apart from small facet effusions at L4-L5 and L5-S1." (Tr. 401). There was "no marrow edema," "no significant canal or foraminal stenosis," and no evidence of spondylolysis or scoliosis. (*Id.*). At the plaintiff's appointment in July 2017, APRN Mayerson noted her belief that "there [was] a certain amount of noncompliance on patient's part" with physical therapy. (Tr. 398-99). Treatment notes reflect that the plaintiff was "positive for back pain" and "negative for gait problem," though the plaintiff did not "appear to have significant back pain today." (Tr. 399).

In November 2017, APRN Mayerson again treated the plaintiff for back pain and this time referred her to rheumatology at the University of Connecticut. (Tr. 598-601). The plaintiff had "continued pain in her right upper extremity and left lower extremity." (Tr. 602). On examination, the plaintiff's gait was normal, she "[did] not appear to have any difficulty moving her

extremities," and "her legs and arms appear[ed] symmetrical bilaterally without swelling." (Tr. 603).

On February 9, 2018, the plaintiff saw rheumatologist Dr. Santhanam Lakshminarayanan.[2] (Tr. 604-05, 608-11). On examination, the plaintiff's neck shoulders, elbows, hands, knees, feet, and ankles were all normal. (Tr. 610). Dr. Lakshminarayanan noted that there was "soft tissue discomfort . . . in the anterior neck, left posterior shoulder, right posterior shoulder, right chest, left chest, upper back, lower back, right lateral epicondyle, and left lateral epicondyle." (*Id.*). The plaintiff had "12 out of 18 total tender points." (*Id.*). Examination of the plaintiff's back/spine revealed no abnormalities in the plaintiff's thoracic or lumbar curvature, but it showed posterior tenderness and paravertebral muscle spasm. (*Id.*). Dr. Lakshminarayanan assessed chronic pain syndrome. (*Id.*). He suggested cognitive behavioral therapy, encouraged her to exercise, and discussed medications. (Tr. 610-11). He concluded that a further rheumatology follow-up was not needed. (Tr. 611).

Thus, because neither the treatment notes nor the objective diagnostic evidence showed that the plaintiff's joint pain significantly limited her ability to do basic work activities, the ALJ did not err in finding that the plaintiff's joint pain was non-severe.

Additionally, contrary to the plaintiff's argument (Pl.'s Mem. at 5-6), the ALJ did consider the plaintiff's joint pain when formulating her RFC. *See* Tr. 20 (citing the plaintiff's testimony that she had been diagnosed with joint pain); Tr. 21 (citing the plaintiff's complaints of her left leg feeling restless as well as limb pain); Tr. 21-22 (citing APRN Kozelka's physical examination results from October 2011); Tr. 22 (citing the May 2017 results of the plaintiff's MRI of her lumbar

---

[2] The parties' briefs refer to Dr. John Zawidniak, M.D., while the ALJ refers to Dr. Santhanam Lakshminarayanan, M.D. The medical records are not entirely clear as to whether one, or both, of these physicians saw the plaintiff on February 9, 2018 (Tr. 604-05, 608-11); however, it appears that at least Dr. Lakshminarayan saw her. (Tr. 605 (naming Santhanam Lakshminarayanan as the provider on February 9, 2018 at 2:06 p.m.).

spine and the plaintiff's complaints of lower back pain with right sciatica); Tr. 22-23 (citing APRN Mayerson's January 2017, February 2017, and November 2017 treatment notes and physical examination results); Tr. 23 (citing the rheumatologist's diagnosis of chronic pain syndrome and treatment notes). In sum, as noted above, the fact that the plaintiff may have experienced joint pain was insufficient to establish a severe impairment; instead, she was required to demonstrate that her joint pain impaired her ability to perform basic work activities. The record does not contain such evidence. Accordingly, the ALJ did not err in finding that her joint pain was not a severe impairment.

B.    THE ALJ'S ASSESSMENT OF THE PLAINTIFF'S RFC

The plaintiff argues that the ALJ erred in multiple respects when formulating the plaintiff's RFC. First, the plaintiff claims that the ALJ erred in the weight he assigned to the opinions of Dr. Ash-Morgan and Ms. Delaney. (Pl.'s Mem. at 6-10). Second, the plaintiff maintains that the ALJ improperly evaluated the plaintiff's subjective symptoms and made a credibility assessment unsupported by the record. (*Id*. at 11-15). Third, the plaintiff alleges that the RFC assessment was not supported by substantial evidence because it should have included limitations on her exertional ability and provided for no interaction with coworkers. (*Id*. at 15-17). The defendant responds that the ALJ properly considered the medical opinions in the record and the plaintiff's allegations, and that substantial evidence supported the ALJ's RFC assessment. (Def.'s Mem. at 6-15).

1.    MEDICAL SOURCE STATEMENTS

The Court agrees with the defendant that the ALJ did not err in his evaluation of the medical source statements by Dr. Ash-Morgan and Ms. Delaney.

The treating physician rule requires that "the opinion of a claimant's treating physician as to the nature and severity of the impairment [be] given 'controlling weight' so long as it 'is well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (quoting 20 C.F.R. § 404.1527(d)(2) [now (c)(2)]). Conversely, a "treating physician's opinion does not get controlling weight when 'other substantial evidence in the record conflicts with the treating physician's opinion.'" *Wright v. Barnhart*, 473 F. Supp. 2d 488, 493 (S.D.N.Y. 2007) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)). Only "acceptable medical sources" can provide medical opinions and are considered treating sources whose opinions are entitled to controlling weight. *See* 20 C.F.R. §§ 416.927(a)(2), (c).

When the ALJ "do[es] not give the treating source's opinion controlling weight," as happened here, he must "explicitly consider" the factors listed in 20 C.F.R. § 404.1527(c)(2), including (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019) (quoting *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam)). Unless after "'a searching review of the record" the reviewing court is "assure[d] . . . that the 'substance of the treating physician rule was not traversed,'" the ALJ's failure to apply these factors requires remand. *Estrella*, 925 F.3d at 96 (quoting *Halloran*, 362 F.3d at 32).

The treating provider opinions at issue in this case are the medical source statements authored by Dr. Ash-Morgan, a psychiatrist, and Ms. Delaney, a therapist. Taking each in turn, the ALJ assigned Dr. Ash-Morgan's opinion "little weight." (Tr. 24).[3] The ALJ rejected her opinion

---

[3] As noted above, Dr. Ash-Morgan, who treated the plaintiff in September and October 2015, opined that the plaintiff had a limited ability to take care of personal hygiene, to use appropriate coping skills, and to handle frustration appropriately, a reduced ability to care for physical needs, and an average ability to use good judgment regarding safety and dangerous circumstances. (Tr. 319). She also opined that the plaintiff had a limited ability to interact appropriately with others, to ask questions or request assistance, to respect and respond appropriately to others in authority, and to get along with others without distracting them or exhibiting behavioral extremes. (Tr. 320). Finally, she opined that the plaintiff had a limited ability to carry out both single-step and multi-step instructions, to focus long

because they were "inconsistent with the medical evidence of record." (Tr. 24). In support of this finding, the ALJ cited to treatment notes of Dr. Jamrozik from January 2010, February 2010 and March 2010, of APRN Mayerson from October 2015, January 2017, February 2017, March 2017, May 2017, July 2017, and November 2017, and of APRN Allison K. Kozelka from June 2011, July 2011, and October 2011. (Tr. 24). The ALJ noted that, according to these treatment notes, the plaintiff "was consistently normal appearing, fully oriented, alert, well developed, and well nourished," "[h]er mood, affect, behavior, judgment[] and thought content were all consistently normal," and "[she] was better psychologically when she was on her medication." (*Id.*).

A review of the plaintiff's treatment notes supports the ALJ's finding. In January 2010, the plaintiff saw Dr. Jamrozik for anxiety and depression. (Tr. 437). Treatment notes indicate that the plaintiff had occasional suicidal thoughts but appeared to be "in no acute distress" with a "pleasant" affect. (*Id.*). In February 2010, the plaintiff was "doing slight better." (Tr. 435-36). She had a pleasant and cooperative affect. (Tr. 435). Dr. Jamrozik adjusted her dose of Zoloft. (*Id.*). In March 2010, the plaintiff reported to Dr. Jamrozik that her suicidal ideations remained the same even while taking Zoloft. (Tr. 429). The plaintiff reported that "she want[ed] to kill herself," and that she "[thought] about killing herself every day." (*Id.*). She reported that she cried often, which woke her up at night, she had a decreased appetite, and she was not sleeping well. (*Id.*). The plaintiff was soon after admitted to St. Francis Hospital Behavioral Health from March 20, 2010 to March 24, 2010 for suicidal ideation and depression. (Tr. 405-06). In April 2010, the plaintiff presented to Dr. Jamrozik because she had gotten upset earlier that day at school. (Tr. 426). She had "felt very/sad depressed and expressed the wish of having the rope and ending . . . everything."

---

enough to finish simple activities or tasks, to change from one simple task to another, to perform basic activities at a reasonable pace, and to persist in simple activities without interruption from psychological symptoms. (*Id.*).

(*Id.*). The plaintiff's father told Dr. Jamrozik that she had forgotten to take Zoloft that morning. (*Id.*). She denied feeling depressed at the appointment. (*Id.*). Treatment notes indicate that the plaintiff and her father told Dr. Jamrozik that she had been better on the increased dose of Zoloft; however, her moods worsened when she forgot to take the medicine. (Tr. 425). Dr. Jamrozik advised the plaintiff to go to the emergency room if her mood worsened. (*Id.*).

In June 2011, the plaintiff returned to APRN Kozelka. (Tr. 446-48). At that appointment, the plaintiff reported feeling "very angry" and "depressed." (Tr. 446). Treatment notes reflect that the plaintiff had a "flat affect," "poor hygiene," and "appear[ed] unwashed." (Tr. 448). Treatment notes from the plaintiff's July 2011 appointment with APRN Kozelka do not include any notes on the plaintiff's general appearance, mood, orientation, alertness, behavior, affect, judgment or thought content. (Tr. 449). At her appointment in October 2011, the plaintiff appeared "overweight, [with] poor hygiene." (Tr. 451). APRN Kozelka also wrote, "POOR MEMORY, but Normal," in the section of her treatment notes devoted to the plaintiff's "psychiatric" system. (Tr. 450-51). The same treatment notes also indicate that the plaintiff's judgment, insight, mood, and affect were normal, but her recent and remote memory were poor. (Tr. 452). The plaintiff did not report any depression or anxiety at her October 2011 appointment.

The plaintiff saw Dr. Ash-Morgan for a brief period of time from September 29, 2015 to October 26, 2015. (Tr. 322-328). These treatment notes from these visits are illegible. The plaintiff does not point to any statements from these treatment notes. Indeed, they are not included in either party's statement of facts.

In January 2017, the plaintiff saw APRN Mayerson for depression and anxiety. (Tr. 349). APRN Mayerson's treatment notes do indicate, as the ALJ referenced, that the plaintiff had a "normal mood and affect," normal "judgment and thought content," and normal "behavior" at this

appointment. (Tr. 353). She was also "well-developed and well-nourished" and "oriented to person, place and time." (*Id.*). The treatment notes also reflect that the plaintiff presented at the appointment "for a follow-up of depression and anxiety." (Tr. 352). She stated that she was hospitalized as a teenager for suicidal intentions and "recall[ed] that the medicines helped somewhat but she did not stay on them because of side effects." (*Id.*). She stated that she "was feeling suicidal" "about a month ago" and that her "moods swing widely every day." (Tr. 352). The plaintiff "denie[d] suicidal intention or plan" at the appointment. (*Id.*). APRN Mayerson prescribed Lexapro and Seroquel. (Tr. 351). Three weeks later, the plaintiff saw APRN Mayerson for depression. (Tr. 355). She reported that her "anger [had] much improved" and that she had been taking the Lexapro. (Tr. 382). Treatment notes reflect that "overall things [had] improved." (*Id.*). The plaintiff was "positive for dysphoric mood," "negative for suicidal ideas, sleep disturbance and self-injury," and "nervous/anxious." (*Id.*). The treatment notes also state that she had a normal mood, affect, behavior, judgment and thought content. (Tr. 383).[4]

On February 17, 2017, the plaintiff returned to APRN Mayerson. (Tr. 385). The plaintiff and her mother reported that the "Lexapro [did] seem to be helping" but that she had "some increase in anxiety symptoms." (Tr. 388). APRN Mayerson encouraged the plaintiff to try Seroquel in combination with Lexapro. (*Id.*). Treatment notes from this appointment reflect that the plaintiff "denie[d] any suicidal ideation," but was "positive for dysphoric mood" and was "nervous/anxious." (*Id.*). As noted above, the treatment notes also indicate that the plaintiff had a normal mood and affect, behavior, judgment and thought content. (Tr. 389).

---

[4] Several of APRN Mayerson's treatment notes reflect this apparent inconsistency, stating that the plaintiff had both a "dysphoric" mood and a "normal mood" and that she was both "nervous/anxious" and had a "normal" affect and behavior. (*See* Tr. 382-83 (January 2017), Tr. 388-89 (February 2017), Tr. 394-95 (March 2017), Tr. 398-99 (July 2017), Tr. 597 (November 2017)).

The plaintiff saw APRN Mayerson again on March 24, 2017. (Tr. 393). The plaintiff reported that it was "hard for her to remember to take [Lexapro] in the morning," that "she thought that if she forgot the Lexapro she could not take the Seroquel so sometimes she [had] not taken the Seroquel either," and that she "[had] forgotten [to take] the Lexapro at times." (Tr. 393-94). She reported that "taking both medications together seem[ed] to help." (Tr. 394). APRN Mayerson counseled her on taking the medications. (*Id.*). The plaintiff stated she "[would] continue with counseling." (*Id.*). She was "positive for dysphoric mood," "negative for sleep disturbance," and "nervous/anxious," but she "denie[d] suicidal ideation." (*Id.*). According to the treatment notes, she also had a normal mood and affect, behavior, judgment and thought content. (Tr. 395).

On July 21, 2017, the plaintiff's "anxiety and depression were worse." (Tr. 398). She had "not [been] sleeping well," and she had stopped taking her medications because she "[did] not feel that they helped her." (Tr. 398). She had taken the Seroquel once only. (*Id.*). Treatment notes reflect that "[the] patient will restart the medication that she has." (*Id.*). The plaintiff was "positive for sleep disturbance and dysphoric mood," "negative for suicidal ideas and self-injury," and "nervous/anxious." (Tr. 399). The treatment notes also state that the plaintiff had a normal mood and affect, behavior, judgment and thought content. (*Id.*).

On November 10, 2017, the plaintiff saw APRN Mayerson, complaining of "significant anxiety." (Tr. 596-97). She had "stopped her medications again because she . . . gets afraid of how they make her feel." (Tr. 597). APRN Mayerson recommended that the plaintiff follow-up with psychiatry. (*Id.*). According to APRN Mayerson, the plaintiff "require[d] a higher level of care regarding psychiatric medications." (*Id.*). Her treatment notes indicate that the plaintiff was "positive for dysphoric mood," "negative for suicidal ideas," and "nervous/anxious." (*Id.*). They

also reflect, however, that the plaintiff had a normal mood and affect, behavior, judgment and thought content. (*Id.*).

On November 17, 2017, the plaintiff was similarly "positive for dysphoric mood," "negative for suicidal ideas," and "nervous/anxious." (Tr. 602). And again, the treatment notes also reflected that the plaintiff had a normal mood and affect, behavior, judgment and thought content. (Tr. 603). APRN Mayerson's treatment notes from October 2015 and May 2017 primarily deal with the plaintiff's physical complaints. (Tr. 396-97, 458-59).

Thus, a review of the treatment notes does not reveal limitations to the extent opined by Dr. Ash-Morgan. Specifically, nothing in the medical records suggests that the plaintiff had a limited ability to carry out single-step instructions, to focus long enough to finish simple activities or tasks, to change from one simple task to another, to perform basic activities at a reasonable pace, or to persist in simple activities without interruption from psychological symptoms. Moreover, the medical records reflect a certain amount of noncompliance on the plaintiff's part with her medication and, as noted by the ALJ, an improvement of symptoms when the plaintiff did take her medication. (Tr. 349-53, 355, 382-83, 385, 388-89, 393-95, 398-99, 425-26, 435-37, 596-97, 602-03). Further, no other physician opined to such limitations. The ALJ thus did not err when he found that Dr. Ash-Morgan's opinion was inconsistent with the medical evidence. Moreover, though not addressed by the ALJ, Dr. Ash-Morgan treated the plaintiff for less than one month. Accordingly, the ALJ did not err in his treatment of Dr. Ash-Morgan's opinion.

Additionally, the ALJ properly evaluated Ms. Delaney's opinion. The ALJ gave Ms. Delaney's opinion partial weight, noting first that "her opinion regarding the [plaintiff's] ability to handle single-step instructions and issues with social interaction . . . [was] generally consistent with the medical evidence of record." (Tr. 24). The ALJ incorporated these findings into the RFC.

The ALJ then found, however, that Ms. Delaney's "opinion that the [plaintiff] may have problems with personal hygiene . . . [was] generally inconsistent with the treatment notes, as the [plaintiff] reported that she had no problems with her personal care." (*Id.*). The plaintiff takes issue with this assessment and argues that the ALJ failed to discuss several of Ms. Delaney's findings.

At the outset, as a licensed marriage and family therapist, Ms. Delaney is not considered a treating source whose opinion is entitled to controlling weight. *See Griffin v. Colvin*, No. 3:15CV105 (JGM), 2016 WL 912164, at *14 (D. Conn. Mar. 7, 2016) ("[A] licensed marriage and family therapist, is not an 'acceptable medical source' whose medical opinion can be afforded controlling weight."). Though not entitled to controlling weight, opinions from "other sources" are still considered when making "a determination or decision about whether the individual is disabled." SSR 06-03P, 2006 WL 2329939, at *4 (S.S.A. Aug. 9, 2006).

The plaintiff argues that the ALJ failed to discuss seven of Ms. Delaney's findings. (Pl.'s Mem. at 7).[5] Preliminarily, the ALJ addressed the plaintiff's ability to interact appropriately with others and to get along with others without distracting them. In fact, he credited her opinion. (*See* Tr. 24, 333 (finding that Ms. Delaney's opinion regarding the plaintiff's "issues with social interaction" was "generally consistent with the medical evidence."). As to the remaining five findings, the ALJ did not specify whether he found Ms. Delaney's opinion to be consistent or inconsistent with the medical evidence. A remand is not required on this basis, however, because the ALJ had no such obligation. *See Petrie v. Astrue*, 412 F. App'x 401, 407 (2d Cir. 2011) (summary order) (holding that, where "the evidence of record permits us to glean the rationale of

---

[5] The plaintiff argues that the ALJ "failed to discuss Ms. Delaney's findings that the plaintiff frequently had a problem with the ability to persist in simple activities without interruption from psychological forces, interact appropriately with others, and handle frustration appropriately, sometimes had a problem with getting along with others without distracting them, focusing long enough to finish simple activities or tasks, [and] changing from one simple tasks to another, and always had a problem with asking questions and requesting assistance." (Pl.'s Mem. at 7).

an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient[.]" (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)). Moreover, here, the ALJ noted Ms. Delaney's findings that the plaintiff frequently had problems with frustration and "sometimes to frequently" had problems with most areas of task performance, but "was fine" with single-step instructions and pace, making it clear that he considered all of Ms. Delaney's findings. (*See* Tr. 24).

The plaintiff also faults the ALJ for not referencing Ms. Delaney's January 18, 2018 letter. (Tr. 460-61). In this letter, she stated that the plaintiff was experiencing "a decrease in functioning and increase in symptomology." (Tr. 460). She had seen "minimal improvement with [the plaintiff] regarding mood, symptoms, and emotional regulation during the course of treatment" and noted that the plaintiff was "currently experiencing high levels of distress in almost all areas." (*Id.*). The ALJ did not err by failing to address this letter in his decision. This letter is not a medical opinion on the plaintiff's functional abilities or limitations and is not medical opinion evidence. *See* 20 C.F.R. § 404.1527(a)(1) ("Medical opinions are statements from acceptable medical sources about the nature and severity of your impairment(s), including your diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.").

## 2. SUBJECTIVE COMPLAINTS AND CREDIBILITY ASSESSMENT

Contrary to the plaintiff's argument, the ALJ properly evaluated the plaintiff's subjective symptoms and made a credibility assessment supported by the record. The Second Circuit has stated:

> When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account . . . , but is not required to accept the claimant's subjective complaints without question; he may exercise discretion

in weighing the credibility of the claimant's testimony in light of the other evidence in the record.

*Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citations omitted); *see Watson v. Berryhill*, 732 F. App'x 48, 51-52 (2d Cir. 2018) (summary order); 20 C.F.R. § 404.1529; Social Security Ruling 96-7p, 1996 WL 374186, at *2-3 (S.S.A. July 2, 1996).

The regulations provide the following two-step process for an ALJ to apply when assessing a claimant's subjective complaints of pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . . That requirement stems from the fact that subjective assertions of pain *alone* cannot ground a finding of disability. . . . If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record. . . . The ALJ must consider [s]tatements [the claimant] or others make about [her] impairment(s), [her] restrictions, [her] daily activities, [her] efforts to work, or any other relevant statements [she] make[s] to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings.

*Genier*, 606 F.3d at 49 (emphasis original; citations and internal quotations marks omitted).

In this case, the ALJ applied the two-step evaluation process and found that, after "careful consideration of the evidence," the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." (Tr. 20-21).

Preliminarily, the plaintiff is incorrect that "[t]he activities described by the ALJ . . . are not consistent with the plaintiff's testimony." (Pl.'s Mem. 12). The ALJ correctly noted that the plaintiff reported performing the following activities: making her own meals, doing her own laundry, spending time with a friend next door, seeing her brother, going shopping with her mother,

using the computer, sometimes cleaning her room, making coffee for her father, putting food in the microwave for him, feeding the pets, preparing simple meals for herself, riding in a car, counting change, being able to handle a savings account and use a checkbook, chatting on the computer, playing video games, and drawing. (Tr. 21, 23, 40-42, 46-50, 53, 254-61, 345). A review of the plaintiff's testimony and activities of daily living form does not reveal that the ALJ mischaracterized any testimony or other evidence in making these findings.

Additionally, the plaintiff takes issue with the ALJ's finding that the plaintiff's statements were inconsistent with the medical records, which showed stability in her mental condition with treatment. (*See* Tr. 23 (the plaintiff's "statements about the intensity, persistence, and limiting effects" of her symptoms were inconsistent because "while she did appear to have certain symptoms associated with bipolar disorder and anxiety disorder," she "showed stability in her condition through treatment.")). The medical records, however, support the ALJ's statement; treatment notes reflect that the plaintiff improved while on medication for her mental impairment. (Tr. 349-53, 345, 355, 382-83, 385, 388-89, 393-95, 398-99, 425-26, 435-37, 596-97, 602-03). Further, the plaintiff's argument that any stability in her mental condition was inconsistent with her testimony, (Pl.'s Mem. at 14), reflects a disagreement with the ALJ's evaluation of the evidence, not any legal error. This Court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the Court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* It was not unreasonable for the ALJ to find that medical records showing improvement in the plaintiff's mental condition with treatment conflicted with her statements about the intensity, persistence, and limiting effects of her mental impairments.

In sum, "[c]redibility findings of an ALJ are entitled to great deference and . . . can be reversed only if they are 'patently unreasonable.'" *Pietrunti v. Dir., Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997). This Court cannot conclude that the ALJ's decision was patently unreasonable in light of the medical record that the ALJ reviewed. "[I]t is not enough for [the plaintiff] to merely disagree with the ALJ's weighing of the evidence . . . . [The plaintiff] must show that no reasonable factor could have reached the ALJ's conclusions based on the evidence in the record." *Hanson v. Comm'r of Soc. Sec.*, No. 15-CV-150 (GTS) (WBC), 2016 WL 3960486, at *12 (N.D.N.Y. June 29, 2016). The Court cannot say so here and finds no error in the ALJ's evaluation of the plaintiff's subjective complaints and credibility.

### 3. THE RFC ASSESSMENT IS SUPPORTED BY SUBSTANTIAL EVIDENCE

The plaintiff argues that the RFC is not supported by substantial evidence because the ALJ should have found physical limitations associated with her joint pain, and erroneously found that she could interact with coworkers for up to nine percent of the workday.

The plaintiff's RFC is "the most she can still do despite her limitations" and is determined "based on all the relevant evidence in [the] case record[,]" namely, "all of the relevant medical and other evidence." 20 C.F.R. § 404.1527(a)(1), (3); *see also Gonzales v. Berryhill*, No. 3:17-CV-1385 (SALM), 2018 WL 3956495, at *14 (D. Conn. Aug. 17, 2018). "[A]n individual's RFC 'is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting Social Security Ruling ["S.S.R."] 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996)). Before classifying a plaintiff's RFC based on exertional level, an ALJ "must first identify the individual's functional limitations or restrictions and assess [] her work-related abilities on a function-by-function basis[]." *Id.* (internal quotation marks omitted).

However, "[a]n ALJ need not recite every piece of evidence that contributed to the decision, so long as the record 'permits [the court] to glean the rationale of an ALJ's decision[.]'" *Id*. at 178 n.3 (citing *Mongeur*, 722 F.2d at 1040). "This court must affirm an ALJ's RFC determination when it is supported by substantial evidence in the record." *Barry v. Colvin*, 606 F. App'x 621, 622 n.1 (citing 42 U.S.C. § 405 (g)) (summary order); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

Here, as discussed above, the ALJ concluded, after careful consideration of the entire record, that the plaintiff had the RFC to perform a full range of work at all exertional levels, but she could carry out and remember only simple instructions in an environment with few changes in the workplace, she could have no interaction with the public, and she could have only limited interaction with coworkers for less than ten percent of the workday. (Tr. 20).

Contrary to the plaintiff's contentions, the ALJ's findings regarding the plaintiff's exertional ability and ability to interact with coworkers are supported by the record. The ALJ's RFC findings are supported by the treatment notes, the lack of significant diagnostic findings, the opinions of consultative examiner Dr. Vassilopulos, and the opinions of state agency examiners Drs. Decarli and Rau.

First, as discussed above, the medical records do not reflect that the ALJ erred by failing to find exertional limitations. Though the plaintiff reported pain, her gait and range of motion were consistently normal. (Tr. 353, 382-83, 388-89, 392, 394, 396-97, 398-99, 598, 602-03, 608-10, 617-19). A May 19, 2017 MRI of the plaintiff's lumbar spine was "essentially unremarkable." (Tr. 401). At a February 2018 appointment with rheumatologist Dr. Lakshminarayanan, the plaintiff's neck, shoulders, elbows, hands, knees, feet, and ankles were all normal. (Tr. 610). Examination of the plaintiff's back/spine revealed no abnormalities in the plaintiff's thoracic or lumbar curvature,

but it showed posterior tenderness and paravertebral muscle spasm. (*Id.*). Dr. Lakshminarayanan suggested cognitive behavioral therapy, encouraged exercise, discussed medications, and concluded that a further rheumatology follow-up was not needed. (Tr. 610-11).

As to the plaintiff's mental impairment, the treatment notes were consistent with the level of functioning the ALJ assessed in his decision. Nothing in the treatment notes suggests that the plaintiff could not perform simple instructions in an environment with few changes in the workplace or that she could not perform an occupation with only limited interaction with coworkers for less than ten percent of the workday. While APRN Kozelka noted in October 2011 that the plaintiff's recent and remote memory was poor, (Tr. 450-52), the plaintiff's mental status examination results from appointments with APRN Mayerson in January 2017, February 2017, March 2017, July 2017, and November 2017 did not reflect memory impairments. Indeed, treatment notes from these appointments reflect largely normal results, except for a depressed or anxious mood. (Tr. 349-53, 355, 382-83, 385-89, 393-95, 398-99, 596-97, 602-03).  Moreover, the medical records reflect that the plaintiff did not always take her required medication and that her symptoms improved when she was taking her medication. (Tr. 349-53, 355, 382-83, 385, 388-89, 393-95, 398-99, 425-26, 435-37, 596-97, 602-03).

Additionally, the RFC assessment is supported by Dr. Vassilopulos's findings and conclusions as Dr. Vassilopulos's opinion provides substantial evidence in support of the ALJ's RFC assessment. *See Petrie*, 412 F. App'x at 405 ("The report of a consultative physician may constitute . . . substantial evidence.") (citing *Mongeur*, 722 F.2d at 1039). In March 2014, Dr. Vassilopulos noted that the plaintiff "understood and remembered simple instructions" and had "no impairment in executing simple instructions." (Tr. 443). He opined that the plaintiff had no impairment in understanding, remembering or implementing complex instructions. (*Id.*). He also

opined that the plaintiff was moderately impaired in interacting with the public, supervisors, and co-workers, and in being able to respond appropriately to usual work situations and changes in routine work settings." (*Id.*). In June 2016, Dr. Vassilopulos stated that the plaintiff "could perform simple commands" and "had difficulty interacting with people and coping with conflict or stressful situations." (Tr. 347). The ALJ acknowledged these limitations and incorporated them in the RFC, limiting the plaintiff's contact with coworkers, restricting her to simple instructions, and prohibiting any interaction with the public.

The ALJ's RFC assessment is also supported by the opinions of state psychological consultants Drs. Decarli and Rau. Drs. Decarli and Rau opined that the plaintiff was markedly limited in her ability to interact appropriately with the general public, moderately limited in her ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to work in coordination with or in proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and without an unreasonable number and length of rest periods, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and to respond appropriately to changes in the work setting. (Tr. 68-69, 79-80, 85-106). In their opinion, however, she was not significantly limited in her ability to carry out very short and simple instructions, to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to make simple work-related decisions, to ask simple questions or request assistance, and to maintain socially appropriate behavior. (*Id.*). The ALJ similarly incorporated these limitations into the RFC.

The ALJ accounted for the plaintiff's mental limitations in the RFC by concluding that she was limited to work with simple instructions, few changes, no interaction with the public, and limited interaction with coworkers for less than ten percent of the workday. While discounting Dr. Ash-Morgan's opinion, the ALJ still crafted a restrictive RFC which acknowledged that the plaintiff had serious limitations stemming from her mental impairment. The treatment notes and medical opinions do not support more significant restrictions. Therefore, the Court finds that substantial evidence supports the RFC, and accordingly, remand is not warranted.

C.     THE ALJ'S STEP FIVE ANALYSIS

The plaintiff argues that the ALJ's step five finding is not supported by substantial evidence because 1) the ALJ should have applied the standards of SSR 11-2p; and 2) the ALJ improperly relied on VE testimony which was based on a flawed RFC. (Pl.'s Mem. at 10-11, 18-19).

SSR 11-2p provides that "[i]n many young adult cases . . . the grid rules will not direct a conclusion of 'disabled' or 'nondisabled'" because claimants may have "impairments (such as mental and neurological disorders) that cause non-exertional limitations" that may erode the occupational base. SSR 11-2p, 2011 WL 4055665, at * 7. "If a young adult has a substantial loss of one or more of the basic mental demands of competitive, remunerative, unskilled work, the occupational base will be significantly eroded." *Id*. The basic demands of such work include the abilities to: 1) understand, remember and carry out instructions; 2) make simple work-related judgments typically required for unskilled work; 3) respond appropriately to supervision, coworkers and work situations; and 4) deal with changes in a routine work setting. *Id*.

Here, the plaintiff argues that "the ALJ erred in not considering whether the unskilled occupational base was significantly eroded by the plaintiff's inability to respond appropriately to supervisors, coworkers and work situations, the inability to deal with changes in routine work

setting, and considering the plaintiff's communication limitations." (Pl.'s Mem. at 11). The plaintiff submits that, if the ALJ had considered these factors, her occupational base would have been significantly eroded. (*Id.*).

Contrary to the plaintiff's argument, the ALJ's analysis complied with SSR 11-2p. Here, the ALJ acknowledged that the plaintiff had non-exertional limitations and explicitly crafted an RFC which accounted for limitations in understanding, remembering and carrying out instructions, making simple work-related judgments, responding to supervision, coworkers and work situations, and dealing with changes in a routine work setting. Moreover, the ALJ sought and relied on a VE's testimony as to the extent to which the plaintiff's non-exertional limitations eroded the occupational base of unskilled work. (Tr. 26-27).

Additionally, the ALJ did not err in relying on the VE's testimony. "An ALJ may rely on a VE's testimony regarding a hypothetical as long as 'there is substantial record evidence to support the assumption[s] upon which the VE based his opinions,' . . . and [the hypothetical] accurately reflects the limitations and capabilities of the claimant." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (quoting *Dumas v. Schweaiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983) and citing *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981)). Here, the plaintiff acknowledges that the hypothetical posed by the ALJ to the VE was consistent with the RFC. (*See* Pl.'s Mem. at 18). The plaintiff argues, however, that the RFC "is not based on an accurate portrayal of the plaintiff's severe and non-severe impairments and, therefore, the ALJ committed error both in posing the hypothetical and in relying on the VE testimony in response." (*Id.*). This claim simply restates the plaintiff's argument regarding the RFC assessment. As discussed above, however, substantial evidence supports the ALJ's RFC assessment. The ALJ's finding regarding the plaintiff's exertional ability is supported by the medical records, which revealed consistently

normal gait and range of motion, as well as the lack of any significant diagnostic findings. The ALJ's finding regarding the plaintiff's ability to interact with coworkers is supported by the treatment notes (none of which suggest that the plaintiff could not perform simple instructions or could not perform an occupation with only limited interaction with coworkers for less than ten percent of the workday), as well as the opinions of Drs. Vassilopulos, Decarli and Rau.

## VI.     CONCLUSION

For the reasons stated above, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 18) is DENIED. The defendant's Motion to Affirm the Decision of the Commissioner (Doc. No. 19) is GRANTED.

This is not a recommended ruling. The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure. Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3); FED. R. CIV. P. 73(c).

Dated this 26th day of March, 2020 at New Haven, Connecticut.

  /s/Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge